UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES YOUNG,

                              Petitioner,

        -vs-                                          **DECISION AND ORDER**
                                                     **No. 07-CV-0371(VEB)**
ROBERT A. KIRKPATRICK,

                              Respondent.

_____

## I.        Introduction

*Pro se* petitioner James Young ("Young" or "Petitioner"), by means of a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenges the constitutionality of his state

custody pursuant to a criminal judgment entered against him in New York State Supreme Court

(Erie County). Following a jury trial, Young was found guilty of, *inter alia*, burglary in the

second degree (New York Penal Law ("P.L."§ 140.25(2)) (two counts), arson in the second

degree (P.L. § 150.15) (one count), and assault in the third degree (P.L. § 120.00(1)) (one count).

Young has asserted claims contesting the sufficiency of the evidence to support the

various convictions; alleging error in the trial court's failure to hold a hearing on his pre-trial

C.P.L. § 30.30 motion; and assailing trial counsel's performance. Respondent asserts that all of

the claims must fail on the merits.

The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1). For the reasons that follow, the petition is dismissed.

## II.       Factual Background and Procedural History

The following summary of the evidence is the proof as viewed in the light most favorable

to the prosecution, which is the standard the Court must use in determining the merit of Young's insufficiency-of-the-evidence claims.

On January 25, 2001, Arkillia Hubbard ("Arkillia") had lived in the lower apartment at 137 Goemble Avenue in the City of Buffalo with her two children for the past five years. T.59.[1] The upper apartment at Hubbard's house was occupied by Janice Taylor ("Taylor"). *Id.*. Most of the homes on Goemble Avenue were duplexes. T.95.

Petitioner was the biological father of Hubbard's six-year-old daughter. However, Petitioner's and Hubbard's relationship had ended and they did not live together. Petitioner had last visited with his daughter on January 20th. *See* T.60, 61, 73.

At 11:30 p.m. on the night of January 25th, Hubbard had gone to bed. Her boyfriend Antone Martin ("Martin"), whom she had been dating for the past three months, was with her. All of a sudden she heard a "bang" and some other "noises" coming the front of the house, including the porch Hubbard got out of bed and, followed by Martin, headed towards the living room in the front of the house. T.63.

As Hubbard entered her darkened living room, she saw a person's figure–and then she was hit over the head. The person, in a voice which she recognized as Petitioner's, announced, "I knew you was [sic] with that nigger." T.65. Petitioner and Martin, who had followed Hubbard into the room, then began to fight. Hubbard managed to extricate herself from the fracas and called 911 from her bedroom. T.66.

When she returned to the living room, Martin had subdued Petitioner. Petitioner told Martin, "You can have her," referring to Hubbard. T.67. As the bizarre love triangle waited for

---

[1] The notation of "T.___" refers to pages in the trial transcript.

the police to arrive, a man, later identified as Melvin Johnson ("Johnson"), appeared at Hubbard's now-broken front window. Johnson asked what was going on, mentioning that whatever it was, he did not want to become involved. T.68.

Upon spying Johnson, Petitioner told him to "Go get the gun," to which Johnson replied "What gun?" T.68. Johnson attempted to allow Hubbard and Young to release Petitioner under his aegis, but Hubbard refused, telling him that she was detaining Petitioner until the police arrived. Martin, in act of appeasement which would later prove unwise, vetoed Hubbard and acceded to Johnson's plea to release Petitioner.

Before Petitioner got into Johnson's car to leave, he left Hubbard with these parting words:"Bitch, I swear to you I'm going to kill you." T.69.

The following morning, Hubbard and Martin took her children to school and then drove to Cheektowaga in order to purchase a replacement window. Before leaving the house that morning, Hubbard locked her front and back doors, and Martin put a board over the broken window. T.75.

The window-buying errand took longer than expected. Later that morning, when they returned to Hubbard's home so she could check on the house and get her mail, they found nothing out of the ordinary. They then went to Martin's house, which was located, two blocks away, so he could check his mail. T.77. As Hubbard waited in the car for Martin to return, she used his cell phone to check her answering machine for messages. When she hung up, Martin's cell phone rang and to her surprise she saw her home telephone number displayed on the screen. T.78. Thinking petitioner was at her house, Martin and Hubbard headed to 137 Goemble.

When they got there, Hubbard tried to open her front door. Meanwhile, suspecting

something was amiss at the house, Martin retrieved his shot gun from the trunk of his car. T.79, 80. Martin finally was able to open the door.

While Hubbard was standing outside on the porch, she saw a cushion from her couch came sailing through open front door. Martin directed her to leave the porch because an intruder was in the house. T.80.

As Hubbard stood on the sidewalk, she observed smoke coming out from under her front door. The smoke was followed by a "big gulp of fire." T.80. Hubbard began screaming that the house was on fire. Her cries brought the upstairs resident, Taylor, and Taylor's friend, John Hall, ("Hall") running from the upstairs apartment. T.82.

On the day after the fire, Petitioner called Martin's cell phone. Hubbard answered and asked him what he was thinking. Petitioner told her that he did set the fire "because she was with that nigger," and threatened that he would not stop until she was dead. T.85.

Petitioner's acquaintance, Johnson, provided the following testimony about the events of January 25, 2001. That night, he was at the home of his girlfriend, Danielle King ("King"), who happened to be Petitioner's sister. At 11:00 p.m., Petitioner asked him for a ride to Hubbard's home. T.105, 107. Johnson drove Petitioner to the address and parked and waited in his car two houses away. T.108.

When Johnson heard people on a porch nearby talking about a commotion at Hubbard's home, he got out to investigate. He observed that the front window on Hubbard's porch was broken and inside he saw Petitioner fighting with Martin. T.111. From the sidelines, Johnson attempted to convince Martin to release Petitioner so they could leave and asked Hubbard not to call the police. T.112. Johnson recalled that he showed Hubbard his driver's license so that she

would not think he was attempting to enter her home, although it is not clear how or why that would have reassured her. T.112.

Antone Martin's testimony was consistent with that provided by his girlfriend, Arkillia Hubbard. On the night of January 25th, he was in her bedroom when he heard the sound of breaking glass in the living room at the front of the house. T.254, 256. Martin followed Hubbard to the dark living room where a man (later identified as Petitioner) hit her and yelled at her as she fell to the floor. T.257. Martin was unable to see Petitioner's face or understand what he was saying. T.257. Martin jumped on top of Petitioner and they wrestled on the couch, eventually falling onto the floor on top of Hubbard. T.258. Martin recalled that Petitioner struggled to get away, biting Martin's arm and scratching his face in the process. T.260. When Martin released him and pushed him out the front door, Petitioner yelled, "You can have Arkillia, you can have the bitch. I'm going to kill you." T.264.

After Petitioner left, Martin put a piece of wood over the broken front window and observed that Petitioner's bite mark had broken his skin. T.267. Martin applied an antibacterial ointment to the wound which left him with a sore arm for two weeks and a scar for three months. T.267. The skin on his face where Petitioner had scratched him was broken, bleeding, and swollen. A scar remained for two weeks, fading gradually after that. T.268, 269.

On the following morning, Martin accompanied Hubbard as she took her children to school and then they took the broken window to be repaired in Cheektowaga. T.270. While waiting for the window to be repaired, Martin returned with Hubbard to 137 Goemble so she could check her mail and they then drove to his home so he could do the same. T.273. When he returned to the car, Hubbard gave him his cell phone which rang. The phone displayed the caller

as Hubbard. T.274. When Martin answered, the caller hung up, at which time they headed to Hubbard's home. T.275.

Martin did not see any smoke or flames on their arrival. While Hubbard went to open the front door, Martin went to his trunk for his shotgun. T.276. Hubbard was unable to open the front door so Martin pushed on it and it opened. Inside, he saw Petitioner standing in front of a fire on the floor, spreading up the curtains. T.278. Petitioner threw a cushion from the couch at Martin, causing him jump back outside onto the porch. T.279. When Martin entered the house again, Petitioner was gone and the fire had spread. In the rear of the house he found the back door leading to the upstairs apartment open; the back door leading into Hubbard's apartment was open as well. T.280, 281.

The upstairs neighbor, Taylor, also testified regarding the events of the following morning, January 26, 2001. At about 11:00 a.m., Taylor was in her apartment at the upper level of 137 Goemble Avenue with her boyfriend, Hall. T.114. Taylor heard Hubbard screaming her name and telling her to get out because the house was on fire. T.116. Taylor recalled that as she ran down the back stairs she smelled smoke. T.117. Outside, the front window and door of Hubbard's apartment were engulfed in flames which reached her (Taylor's) apartment. The fire left Hubbard's house in total ruins. She was never able to return to it. Similarly, Taylor testified that she was not able to return to her apartment and lost everything in the fire.

The investigation into the blaze conducted by Buffalo Fire Investigator George Arthur ("Investigator Arthur") revealed that the point of origin of the fire was an open flame to the couch. T.187, 190. Investigator Arthur ruled out accidental and natural causes. T.202-09. He noted that the smoke, gases and carbon dioxide emitted as a result of the fire in the lower

apartment had entered the upper apartment; these substances all were hazardous to humans. T.210.

Lori Clemons ("Clemons"), Petitioner's ex-girlfriend, testified that she had spoken with him on the night of January 25th. According to Clemons, Young told her that he had gone to visit his daughter and became embroiled in a fight with Hubbard's boyfriend, Martin. Petitioner also told her that the police had been called and he thought he was going to jail. T.144.

According to Clemons, Petitioner called her again on the morning of January 26th and came over to her house at an unspecified time. Clemons testified that Young used the telephone while he was there. Young eventually departed Clemons' house at 11:50 a.m. T.144, 145. Clemons left her home at 12:25 p.m. to pick up her daughter from school. On her way back home she saw smoke on Goemble Avenue and realized that it was coming from Hubbard's house. T.147.

When Clemons arrived back home, she received a phone call from Petitioner. Clemons asked Petitioner how he could "do something like that" (i.e., set fire to the house where he knew his children lived). Petitioner acted like he did not know what she was talking about. T.148, 149. In response to Clemons' question of where he had been that morning (January 26th), he named several different places. Petitioner then asked her to be his alibi. T.149, 151. Clemons refused.

About a week later, on February 1, 2001, Petitioner telephoned Clemons again. This time he asked her another favor–namely, that she file charges against Hubbard for allegedly having harassed her (Clemons). When Clemons asked why, Petitioner told her that he thought Hubbard was sending the police to her (Clemons') house to look for him. Clemons refused to do as Petitioner asked, because Hubbard had not harassed her. T.153.

Clemons also recalled that sometime in the month of January 2001, Petitioner had asked if they could resume their relationship and she told him she did not know. T.154. When he asked again in February and she declined, Petitioner told Clemons to "watch her back or she would get the same treatment Hubbard got." T.154.

The jury returned a verdict finding Young guilty as charged in the indictment. He was sentenced to a term of 11 to 13 years and is currently serving this sentence. On direct appeal, the Appellate Division, Fourth Department, unanimously affirmed the conviction. Leave to appeal to the New York Court of Appeals was denied.

## III.    General Legal Principles

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 372 U.S. 362, 375-76 (2000). An "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim. *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2000).

Federal habeas review is available for a State prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Errors of state law are not subject to federal habeas review. *See, e.g., Estelle v McGuire*, 502 U.S. 62, 67-68 (1991); *Cupp v Naughten*, 414 U.S. 141, 146 (1970).

#### IV. Discussion of the Petition's Claims

##### A. Ground One: The evidence was legally insufficient to support the verdicts.

###### 1. General legal principles

A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus proceeding "bears a very heavy burden." *Fama v. Commissioner of Corr. Srvs*, 235 F.3d 804, 813 (2d Cir.2000). Habeas corpus relief must be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *accord, e.g., People v. Contes*, 60 N.Y.2d 620, 621, 467 N.Y.S.2d 349, 349-350, 454 N.E.2d 932 (N.Y.1983). This sufficiency-of-evidence "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

Under the *Jackson* standard for reviewing evidentiary sufficiency, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *accord Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal."). The court must determine "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt . . . view[ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.1983) (internal citations omitted), *cert.*

*denied sub nom. Mont v. United States*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).

A federal court reviewing an insufficiency-of-the-evidence claim must look to state law to

determine the elements of the crime. *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999)

(citation omitted), cert. denied, 528 U.S. 1170, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000).

### 2.    Analysis of petitioner's legal insufficiency claims

On direct appeal, the Appellate Division concluded, without explanation, that all of the

verdicts were supported by legally sufficient evidence. The Appellate Division cited *People v.*

*Contes,* which applied the federal due process standard as set forth in *Jackson v. Virginia*. For the

reasons discussed below, I conclude that the Appellate Division correctly applied the relevant

federal law to find the evidence supporting Young's convictions to be legally sufficient.

I turn first to the verdicts on the second degree arson charges and the reckless

endangerment charges.  "Reckless endangerment is not simply a "catch-all" crime for arsonists. It

is a crime for anyone who recklessly creates a grave risk of death to another person, whether he

creates that risk by driving a car, shooting a gun, or starting a fire." *People v. Rodriguez*, 110

Misc.2d 828, 832, 442 N.Y.S.2d 948, 951 (N.Y. Sup. Ct. 1981).  "[When] [a] person . . . starts a

fire under circumstances evincing a depraved indifference to human life . . . [i]t follows that if

the other person is neither killed nor seriously injured, but is recklessly exposed to a grave risk of

death, then the perpetrator may be properly charged with both arson and reckless endangerment."

*Id.* (internal citations omitted). Second degree arson requires that the building be occupied, and

that "the defendant knows that fact or the circumstances are such as to render the presence of

such a person therein a reasonable possibility." N.Y. Penal Law § 150.15; *see also*, *e.g.*, *People*

*v. Lingle*, 34 A.D.3d 287, 288, 825 N.Y.S.2d 12, 13 (App. Div. 1st Dept. 2006).

In regard to these charges, Young he argues that there was insufficient proof that he knew for a fact there were upstairs tenants, or that circumstances were such as to render the presence of a tenant in the upper apartment a reasonable possibility. *See* N.Y. PENAL LAW § 150.15. Young argues that he did not know the upstairs tenants (Taylor and her boyfriend, Hall), and claims to have been unaware that there was a rear entrance to the home for those tenants. However, I agree with respondent that there was ample proof introduced at trial that the circumstances, of which Young had knowledge, were such as to render the presence of another person or persons in the building a reasonable possibility. First, the testimony revealed that most of the homes on Goemble Avenue were duplexes or doubles. T.95, 223. Young had been to Hubbard's home on the evening of January 19th, where he spent a few hours visiting. T.72. He returned the following morning and spent the day with his daughter, leaving later that night. T.73, 74. Young then actually broke into Hubbard's home on the night of January 25th. In light of his burglary of the house, and the fact that he had spent an entire day and evening with his daughter at the house six days before the fire, Young clearly had adequate familiarity with the structure of the house and could not have been unaware that there was an occupied, upstairs apartment. That someone may have been home at 11:30 a.m. during the morning is not an unreasonable possibility. Although Young contends that he was "unaware" of the rear entrance, he certainly became aware of it after starting the fire and realizing that in order to escape through the front door, he would have had to have to run past Martin and Hubbard who were in the front of the house.

I turn next to the second degree burglary conviction regarding the incident on January 25th. Under the fifth count of the indictment, Young was charged with "knowingly entering unlawfully in [sic] the dwelling of Arkillia Hubbard with intent to commit a crime therein." *See*

N.Y. Penal Law § 140.25(2) ("A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when: . . . . 2. [t]he building is a dwelling."). Young contends that the prosecution did not produce sufficient evidence of his felonious intent in entering the home; in other words, the prosecution did not prove that he broke into the house with the intent of assaulting Hubbard or Martin. Instead, Young argues, his entry into Hubbard's house was motivated by a desire to see his daughter.

"[T]o secure a conviction for burglary the State 'need not establish what particular crime the intruder intended to commit', nor is it necessary that the intended crime in fact be committed." *People v. Mackey*, 49 N.Y.2d 274, 279, 401 N.E.2d 398, 401, 425 N.Y.S.2d 288, 290 (N.Y. 1980) (internal quotation and citation omitted). Where a defendant is discovered inside a building without permission, his intent to commit a crime therein may be inferred from the circumstances of the case. *E.g.*, *People v Mitchell*, 254 A.D.2d 830, 831 (App. Div. 4th Dept.) ("Defendant's intent to commit a crime may be inferred from the circumstances of the entry, from defendant's unexplained or unauthorized presence on the premises and from defendant's actions and assertions when confronted by the police or the owner[.]") (citations omitted), *lv. denied*, 92 N.Y.2d 984 (N.Y. 1998); *People v. Daye*, 150 A.D.2d 481, 482). In *People v. Daye*, the "defendant inserted his arm through the complainant's back door after breaking the glass and bending the screen[,]" and "[w]hen the complainant screamed, the defendant fled." *Id.* The appellate court found no merit to the defendant's contention that the prosecution failed to establish that he intended to commit a crime inside the complainant's home. *Id.* Noting that the "intent necessary for burglary can be inferred from the circumstances of the entry itself [,]" *id.*

(citations omitted), the appellate held that "[u]nder the circumstances, the jury properly inferred that the defendant intended to commit a crime while inside the complainant's home[,]" *id.* (citations omitted); *see also id.* ("It is well settled that 'in deciding whether the People met their burden, we are required to say whether, considering the facts proved and the inferences that could reasonably be drawn therefrom, [the fact finder] could conclude that there was no reasonable doubt that the defendant' intended to commit [a] crime[.]") (quotation and citations omitted; alterations in original); *see also People v. Barnes*, 50 N.Y.2d 375, 381 (N.Y. 1981) ("Turning to the issue whether the People established defendant's guilt beyond a reasonable doubt, we think it abundantly clear that such burden was met. . . .[T]he element of intent is rarely satisfied by an explicit expression of culpability by the perpetrator; rather, "in deciding whether the People met their burden, we are required to say whether, considering the facts proved and the inferences that could reasonably be drawn therefrom, [the fact finder] could conclude that there was no reasonable doubt that the defendant" intended to commit the crimes charged. Here, defendant was discovered crouched behind a table or desk in the middle of the night in a store which obviously was the target of widespread looting. The security gate was torn from the front of the establishment, and the windows were smashed leaving pieces of shattered glass about the entry to the premises. Further, access to the store could not be accomplished by wandering in from the street; rather, it appears that entry could only be gained by straddling a two-foot ledge strewn with jagged glass. Under these circumstances, the proof permitted the inference to be drawn that defendant's entry into the premises was effectuated with the intent to commit a larceny therein.") (internal quotation and citations omitted; alteration in original).

Petitioner had contacted Hubbard on January 19th and 20th and had been given access to

his daughter on those occasions. On the night of January 25th, he waited until 11:00 p.m. to decide to "visit" his six-year old child. Notably, when he asked his acquaintance, Johnson, for a ride, he did not mention anything about going to visit his daughter at Hubbard's house. Once there, petitioner banged on the door to gain entry. Receiving no response, he broke the window and crawled inside. When confronted by Hubbard, he did not tell her he was there to visit his daughter or apologize for breaking her window. Instead, petitioner hit her over the head telling her "Bitch, I knew you was [sic] with that nigger."

Under the circumstances here, it is abundantly clear that the element of felonious intent was satisfied. As an initial matter, Young's claim that he was there to see his daughter is simply unworthy of belief. His manner of entering the house and his actions when confronted by Hubbard and Martin clearly negated any suggestion that his presence there was for a non-criminal purpose. When considered together with his violent and destructive actions, Petitioner's comment reveals that he entered Hubbard's home in a jealous rage with the intent to assault her and Martin because they were there together.

Young also challenges the sufficiency of the evidence regarding the burglary committed the following day, January 26th. He contends that the prosecution failed to prove the intent-to-commit-a-crime element by failing to adduce sufficient proof that he entered the home again the following day with the intent to start a fire. In particular, Young points to the absence of any fire-starting materials found in Hubbard's house. He also notes that no one actually witnessed him set the fire. Although Petitioner was not seen starting the fire, he was the only person in the home when the blaze broke out, and he was standing right in front of the flames. Notably, Petitioner also admitted to Hubbard that he started the fire because she was with Martin, and he

would "not stop until she was dead." T.85. When he had broken into her house the previous night, he threatened that he was going to kill her. T.69. There was thus strong circumstantial and direct proof that Young unlawfully entered the house with the intent to commit arson. Even without the direct proof (i.e., Petitioner's admission), there was more than sufficient circumstantial evidence to establish that "the hypothesis of guilt . . . flow[ed] naturally from the facts proved, and [was] consistent with them, and that the facts proved . . . exclude[d] to a moral certainty every reasonable hypothesis of innocence[,]" *People v. Lagana*, 36 N.Y.2d 71, 74, 365 N.Y.S.2d 147, 324 N.E.2d 534).

Finally, Petitioner assails the sufficiency the evidence supporting the assault charges involving Hubbard's boyfriend, Martin. Petitioner claims that there was no proof that Martin sustained physical injury within the meaning of the statute as a result of Petitioner's conduct. This claim is without merit. Martin testified that during the struggle with Petitioner he sustained a bite on his arm and a scratch on his face. The bite broke the skin, resulting in soreness to Martin's arm for two weeks and a visible scar for three months. T.267. The scratch on Martin's face broke the skin, bled, became swollen, a resulted which was visible for two weeks. T.268, 269. Contrary to Petitioner's contention, the evidence was sufficient for a rational jury to find that the prosecution had proved beyond a reasonable doubt that Martin suffered "physical injury" within the meaning of N.Y. Penal Law § 10.00 (9). *See also*, *e.g.*, *In re Yolanda B*, 283 A.D.2d 426 (App. Div. 2d Dept. 2001) ("[T]he evidence adduced at the fact-finding hearing established that the victim, who was attacked by the appellant and her two friends without provocation, sustained physical injury within the meaning of Penal Law § 10.00 (9). . . . During the attack the appellant hit and kicked the victim in the head and body and bit the victim on the arm. At the

time of the hearing, more than one year after the incident, the mark left by the bite was still evident on the victim's arm. The victim testified that for a period of approximately one month after the incident, she suffered pain in the arm which felt like a 'bad sunburn,' and that she suffered severe pain when she exerted pressure on the arm.") (internal citations omitted).

For the foregoing reasons, the evidence adduced by the prosecution with regard to each of the charges was legally sufficient to satisfy the requirements of due process as stated in *Jackson v. Virginia*.

**B.     Ground Two: Denial of due process as a result of the trial court denying his motion pursuant to C.P.L. § 30.30 without a hearing**

Young contends that his right to due process was violated when the trial court denied his "speedy trial" motion, brought under C.P.L. § 30.30,[2] without conducting a hearing. Respondent argues that the claim is without merit because the People fulfilled their statutory obligation under C.P.L. § 30.30 by declaring their readiness for trial two days after the trial court had declared a mistrial. Thus, respondent explains, the trial court had a factual basis on which to make the necessary findings on petitioner's motion and no hearing was required.

More important, however, is that this claim does not present a constitutional question cognizable on federal habeas review since it merely asserts a violation of a state statute, i.e., C.P.L. § 30.30. *Accord*, *e.g. Smith v. LaClair,* No. 04 Civ. 4356(SAS), 2008 WL 728653, at *3 (S.D.N.Y. Mar. 17, 2008).  is not cognizable on federal habeas review. (citations omitted).  "It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violated the Constitution, laws, or treaties of the United States."

---

[2]     Section 30.30 mandates that the people be ready for trial within six months of the commencement of a criminal action where the defendant is accused of at least one felony. See C.P.L. § 30.30 (1)(a).

*Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir.2002) (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)). Rather, "C.P.L. § 30.30 sets forth a statutory time frame in which the People of the State of New York must be ready for trial" and is "merely a state law provision requiring the prosecution to be ready for trial." It is "not, as such, a statutory embodiment of the constitutional guarantee to a speedy trial. *Smith v. Murray*, No. 03-CV-6553L, 2007 WL 2581687, at *6 (W.D.N.Y. Sept. 5, 2007). Thus, district courts in this Circuit have consistently held that a claimed violation of C.P.L. § 30.30, be it substantive or procedural, does not raise a federal constitutional issue. *Id.* Thus, even if the trial court erroneously had failed to hold an evidentiary hearing on Petitioner's C.P.L. § 30.30 motion, this omission cannot support a due process claim in a federal habeas proceeding. *Id.* Accordingly, Young's due process claim–which is premised on the failure of the state court to conduct an evidentiary hearing–must be dismissed. *Accord*, *e.g.*, *Smith v. LaClair*, 2008 WL 728653, at *3.

### C. Ground Three: Ineffective assistance of trial counsel

#### 1. Overview of the *Strickland* standard and petitioner's claim

In order to establish a claim of ineffective assistance of counsel, a defendant must show that his counsel provided deficient representation when compared to prevailing professional norms of practice, and that counsel's errors caused his client to suffer prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Prejudice requires a demonstration of a "reasonable probability" of a more favorable result. *See id.* A reviewing court may review the *Strickland* prongs in either order, and there is no reason to consider both if a petitioner makes an inadequate showing on one. *Id.* at 697.

The Supreme Court cautioned in *Strickland* that "there are countless ways to provide

effective assistance in a given case" and that "even the best criminal defense attorneys would not defend the particular client the same way." 466 U.S. at 689. Determinations regarding the defense strategy adopted at trial are among the "virtually unchallengeable" tactical decisions left to the judgment of trial counsel. *See United States v. Simmons*, 923 F.2d 934, 956 (2d Cir.) (defendant's dissatisfaction with counsel's trial strategy does not establish ineffectiveness), *cert. denied*, 500 U.S. 919 (1991); *United States v. DiTommaso*, 817 F.2d at 215 (lack of success of strategy chosen and pursued by trial counsel does not warrant second-guessing by court). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *Mason v. Scully*, 16 F.3d 38, 42 (2d Cir. 1994) (internal quotation omitted); *accord United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (reasonably made strategic calls do not support ineffective assistance claim); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (stating that "decisions that fall squarely within the ambit of trial strategy, . . . if reasonably made, cannot support an ineffective assistance claim") (internal quotation omitted), *cert. denied*, 507 U.S. 998 (1993). A reviewing court therefore "may not use hindsight to second-guess [counsel's] strategy choices." *Mayo v. Henderson*, 13 F.3d at 533.

Petitioner contends that he was denied effective assistance of counsel at trial because trial counsel (1) failed to call his ex-girlfriend, Clemons, as an alibi witness; (2) failed to object when the prosecution called Clemons as a witness; (3) failed to call his acquaintance, Johnson, who had testified at Petitioner's first trial (which had resulted in a mistrial); (4) failed to object when the prosecution called Johnson as a witness, and (5) failed to call Petitioner's parole officer who had testified previously in Petitioner's behalf.

Petitioner concedes "it is undisputed that [trial counsel]'s decision not to call particular

witnesses relates to trial strategy[.]" out in his Memorandum of Law ("Pet'r Mem.") attached to the Petition at 23 (Docket No. 1) (citing *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. )). He contends, however, that trial counsel's decision not to call certain witnesses was not strategic but rather was "animated by a desire to save himself labor," *id.*, and was "not based on . . . an adequate pre-trial investigation," *id.* (Docket No. 1).

2. **Analysis of trial counsel's alleged errors**

a. **Failure to call Lori Clemons as an alibi witness and failure to object when the prosecution called her as a witness**

Petitioner asserts that trial counsel erred in failing to call his ex-girlfriend, Clemons, as a witness for the defense to support his alibi. Relatedly, he faults trial counsel for failing to object when the prosecution called her as a witness.

Taking the issue of failure-to-object first, Young sets forth no legal basis upon which to rest this claim. Indeed, there is no basis for the failure to object to Clemons testifying; she was a material witness with relevant, admissible information to offer. Trial counsel had no colorable basis on which to make an objection to her testifying. Thus, Young can show neither that counsel acted in a professionally unreasonable manner, nor that his failure to object prejudiced Young in any way. This claim is frivolous and is dismissed.

I turn next to the claim regarding the failure to call Clemons as a "defense witness." At the first trial, Young contends, Clemons was called as a defense witness. However, the record belies Young's contention: As Respondent points out, Clemons provided the same testimony at both trials. This testimony contained significant evidence that was unfavorable to Young: As detailed above, Young made inculpatory comments to Clemons such as asking her to be his alibi

and threatening her with the "same treatment" that Hubbard received. Thus, Clemons provided important incriminating testimony at the second trial. It was therefore entirely reasonable for counsel not to call Clemons on behalf of the defense and, accordingly, Young cannot demonstrate that trial counsel's performance was deficient. There is no need to consider the prejudice aspect since the failure to make a sufficient showing on one prong of the *Strickland* standard is fatal to a defendant's claim. *See Strickland*, 466 U.S. at 697. This claim is therefore dismissed.

This should be the end of the matter with regard to trial counsel's handling of witness Lori Clemons. However, the claim is complicated by Young's submission of a purported recantation by Clemons, in the form of an affidavit. According to Young, this affidavit, allegedly executed by Clemons in February 2005, contradicts the testimony Clemons gave at both trials "initially accus[ing] the defendant of having set the fire to the dwelling . . . ." Young also asserts that Clemons' statements in her affidavit provide an alibi for him.

Young's trial counsel cannot be faulted for failure to utilize this statement by Clemons, given that it did not come into existence until almost four years after the trial. Accordingly, Young cannot fulfill the "deficient performance" part of the *Strickland* test. I need not evaluate the prejudice component since the failure to adequately demonstrate one prong of the *Strickland* standard is fatal to a defendant's claim. *See Strickland*, 466 U.S. at 697. This aspect of Young's ineffectiveness-of-trial-counsel claim is therefore dismissed.

Keeping in mind that federal courts are to construe a *pro se* litigant's pleadings leniently, so as to raise the strongest arguments the allegations suggest, the Court believes that Young may be raising a claim of newly discovered evidence of innocence. Although Young has styled his

allegations concerning Lori Clemons as grounds for finding trial counsel ineffective, and he has

submitted the affidavit as support for the ineffectiveness claim, he actually is presenting a claim

of newly discovered evidence (i.e., Clemons' post-trial recanting affidavit), *see* Exhibit A,

attached to Petition (Docket No. 1)).

Assuming that Young has fulfilled the applicable exhaustion requirements for such a

claim, Clemons' affidavit does not assist him in his pursuit of the writ. Even assuming that

Clemons' alleged recantation was credible, "[a] claim 'based on newly discovered evidence ha[s]

never been held to state a ground for federal habeas relief absent an independent constitutional

violation occurring in the underlying state criminal proceeding.'" *Ortega v. Duncan*, 333 F.3d

102 (2d Cir. 2003) (quoting *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d

203 (1993)[3] (in turn citing *Townsend v. Sain*, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770

(1963)).

"Following the strictures of the Second Circuit and the majority of courts in the Circuit,

this Court assumes that a freestanding actual innocence claim does not constitute a cognizable

---

[3]        The Supreme Court has yet to resolve the question of whether a freestanding claim of actual
innocence may serve as a basis of habeas relief. It first faced the issue in the context of a habeas death penalty case.
*See Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). While acknowledging that
"[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal
habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings,"
the Supreme Court refused to rule out that possibility. Herrera, 506 U.S. at 400. Instead, the Supreme Court
assumed–"for the sake of argument"–that "in a capital case a truly persuasive demonstration of 'actual innocence'
made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there
were no state avenue open to process such a claim." Id. at 417. The Supreme Court then found that petitioner
Herrera's proffer of evidence did not meet the hypothetical threshold necessary to succeed on a claim of actual
innocence. Id.
        Thirteen years later, the case of *House v. Bell*, 547 U.S. 518, 554-555, 126 S.Ct. 2064, 165 L.Ed.2d 1
(2006), presented the Supreme Court with another invitation to answer the question left open in *Herrera* regarding
the viability of freestanding actual innocence claims in the habeas context. As in *Herrera*, the Supreme Court
declined to answer the question but proceeded to analyze the claim assuming *arguendo* that a cognizable claim
existed. Id. at 555.

ground for habeas relief and denies this petition." *Cole v. Walsh*, 2009 WL 3124771, at \*5 & n. 4 (E.D.N.Y. 2009)(citing, *inter alia*, *Arce v. Commissioner of Corr. Servs.*, 2007 WL 2071713, at \*4 (E.D.N.Y. July 17, 2007) ("Courts in this Circuit have repeatedly held that claims of innocence without reliance on constitutional infirmities in the trial do not present a ground for federal habeas corpus relief."); *United States v. Quinones*, 313 F.3d 49, 68 n. 16 (2d Cir.2002) ("[T]he [Supreme] Court expressly stated in *Herrera* that a claim of 'actual innocence' is not itself a constitutional claim.") (internal citation omitted); *Greene v. Walker*, 1999 WL 1489805, at \*1 (2d Cir. Dec.29, 1999) (summary order) (holding that a claim of actual innocence, standing alone, "fails to demonstrate a constitutional defect that would undermine the underlying conviction").

However,"even assuming such a right exists, and further assuming that it exists in the non-capital context, the Court concludes that Petitioner does not satisfy whatever burden a hypothetical freestanding innocence claim would require." *Cole v. Walsh*, No. 05-CV-736 (SLT)(SMG), 2009 WL 3124771, at \*5 (E.D.N.Y. Sept. 29, 2009) (citing *Herrera*, 506 U.S. at 417 (describing the threshold for any hypothetical freestanding innocence claim as "extraordinarily high")). In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court established that actual innocence may serve as a "gateway" claim (not a stand-alone constitutional claim) to excuse a procedural bar to reviewing underlying, procedurally defaulted constitutional claims if the petitioner can show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. In *House v. Bell*, a habeas case considering the contours of a possible stand-alone actual innocence claim, the Supreme Court opined that whatever the standard was, it "requir[ed] more convincing proof of

innocence than *Schlup*." *House*, 547 U.S. at 555. It stands to reason, then, that a habeas petitioner pressing an actual innocence claim as a basis for habeas relief must establish proof more indicative of innocence than would be required by *Schlup* if petitioner were trying to overcome a procedural bar with a "gateway" actual innocence claim. *E.g.*, *Cole v. Walsh*, 2009 WL 3124771, at *6.

Here, the Court finds that Petitioner's claim "does not satisfy the lower *Schlup* standard and, thus, he necessarily falls short of the threshold implied in *Herrera*." *Cole*, 2009 WL 3124771, at *6. Under *Schlup*, the first part of the analysis is "whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir.2004). The only evidence of "actual innocence" offered by Young is Clemons' alleged recantation. *See* Affidavit of Lori Clemons ("Clemons Aff."), attached as Exhibit A to Petition (Docket No. 1).[4] "It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion.'" *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) (quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) and citing, *inter alia*, *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of *certiorari*) ("Recantation testimony is properly viewed with great suspicion."). The veracity and credibility of Clemons' recantation is highly suspect, given (1) that she had already testified consistently at two trials and (2) that she previously had been threatened with violence by Young when she refused to resume a romantic relationship with

---

[4]    The reliability of Clemons' statement is undermined by the lack of any detail regarding *when* Young allegedly called her or arrived at her house that day. Furthermore, Clemons does not explain why Young called her or came over to her house on the morning the incident occurred; given that the two of them were not in a romantic relationship anymore, it seems strange for Young to have just "stopped by" his ex-girlfriend's house.

him. Thus, the probability that duress and coercion played a part in securing Clemons'
"recantation" cannot be discounted. Clemons fails to explain or otherwise mention her trial
testimony that Petitioner called her after the fire and asked her to file charges against Hubbard
and she refused to do so, and that after she declined his request to resume their relationship, he
warned her to "watch her back or she would get the same treatment Hubbard got." T.154. This
Court accordingly declines to credit Clemons' affidavit purporting to recant her trial testimony,
without having been given under oath and subjected to the rigors of cross-examination.
Considering all the evidence without regard to its admissibility, *Menefee*, 391 F.3d at 162, and
evaluating the record as a whole, *id.*, the "new evidence" is lacking in credibility and reliability.
Thus, Young plainly cannot meet the first part of the *Schlup* "actual innocence" analysis since the
new evidence (i.e., Clemons' recantation) is untrustworthy when considered on its own merits
and in light of the pre-existing evidence in the record.

Substantively, the Clemons affidavit does not "throw[ ] the petitioner's conviction into
doubt," *id.* at 162. Clemons begins her affidavit by stating that Young "called [her] house from a
phone booth on 1/27 [sic][5]/01 in the morning, which [sic] [she] gave him directions to [her] new
home . . . ." Clemons then states that she and Young "stayed at [her] house until around 12
pm[,]" at which time her friend Doug King ("King") came by to give her a ride to pick up her
daughter from school. At that time, Young "left [her] house on foot" and "said he'd call [her]
later." Clemons Stmt. at 1, Exhibit A in the Attachments to the Petition. (Docket No. 1). At trial,
Clemons testified that Petitioner called her on the morning of January 26th and came over to her

---

[5] Clemons mistakenly has referred to the day *after* the fire; the incident occurred on January 26, 2001.

house sometime in the morning. While Clemons now states that Young left at 12:00 p.m., her trial testimony was that he departed her house at 11:50 a.m. T.144, 145. Clemons left her home at 12:25 p.m. to pick up her daughter from school. On her way back home she saw smoke on Goemble Avenue and realized that it was Hubbard's house. T.147. Clemons goes on to relate that after driving back from picking up her daughter (which is presumably sometime after 12 p.m.), she and King "noticed smoke coming from somewhere" so "they decided to go closer . . . ." *Id.* Soon they saw Hubbard standing in the middle of the street "screaming, 'I know James did this' . . . ." *Id.* Clemons states that she and King immediately "left the scene" and returned to her house where she "made a couple of phone calls *to find out where [Petitioner] was.*" *Id.* (emphasis supplied) As respondent points out, Clemons has never been able to provide an alibi for Petitioner as even her affidavit clearly indicates that Petitioner was not with her at the time of the fire. The new evidence decidedly "is insufficient to raise a question as to a petitioner's factual innocence[,]" *Menefee*, 391 F.3d at 162, particularly in light of Martin's unequivocal testimony that it was Petitioner standing in front of the fire on the floor of Hubbard's living room as it was spreading up the curtains. T. 278.

In sum, all of Young's contentions regarding trial counsel's handling of Clemons' testimony and alleged recantation are patently without merit. Therefore, they are dismissed.

### b. Failure to call Melvin Johnson as a witness and failure to object when the prosecution called him as a witness

Next, Young asserts that trial counsel committed errors with respect to the testimony of Johnson, the individual who interceded on his behalf during the various confrontations Young had with Hubbard and Martin. Young claims that Johnson testified at his first trial as a defense

witness, and that proceeding ended in a mistrial; accordingly, he faults trial counsel for failing to have Johnson testify for the defense at the second trial.  As respondent notes, Johnson did not testify at Young's first trial; rather, he testified at the grand jury proceeding, and could not be found to testify at the first trial, notwithstanding the issuance of a material witness warrant.

Ignoring the inconsistencies in his arguments, Young next asserts that trial counsel should have objected to the prosecution calling Johnson as a witness at the second trial. However, as was the case with Clemons, trial counsel had no colorable basis upon which to lodge an objection to Johnson's testimony. Thus, trial counsel was not professionally unreasonable, and Young was not prejudiced, since there is no likelihood such an objection would have succeeded.

### c.      Failure to call Petitioner's parole officer

Petitioner's final complaint regarding trial counsel's performance is that his attorney failed to call his parole officer Paul Saviola ("Parole Officer Saviola")  to testify at trial. According to Petitioner, it was Parole Officer Saviola's testimony which led to a jury deadlock and a mistrial. Specifically, Parole Officer Saviola offered testimony regarding his knowledge of Petitioner's domicile; on direct examination, he testified that Petitioner had been paroled to 137 Goemble Avenue (Hubbard's address) on January 19, 2001.On cross-examination, Parole Officer Saviola admitted that he had no personal knowledge of where Petitioner was living on January 19, and had not visited him at any location after that date. Parole Officer Saviola noted that Hubbard had no obligation to house Petitioner; and if she had asked Petitioner to move out of 137 Goemble, she would have had no duty to contact Petitioner's parole officer. Finally, Saviola testified that Petitioner admitted that he had moved from his approved residence (i.e., 137 Goemble) on January 19 without notifying Parole Officer Saviola, in violation of his parole.

It bears repeating that the decision whether or not to call witnesses, and if so, which witnesses to call, is a matter of trial strategy to which a significant amount of deference is owed. *E.g.*, *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) ("[A]n appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."). Although Parole Officer Saviola provided some helpful testimony, its favorable effect was greatly diminished after the prosecutor's cross-examination. Furthermore, his testimony did have a downside since it revealed Young's lying and non-compliance with his parole conditions. On this record, it was not unreasonable for Young's *fourth* assigned attorney to decline to call Parole Officer Saviola. The testimony of the parole officer certainly did not "make or break" Young's defense; there is no reasonable probability that "but for" the testimony, Young would have had a more favorable outcome at his trial.

V.      **Conclusion**

For all of the foregoing reasons, petitioner James Young's request for a writ of habeas corpus is denied and the petition is dismissed. Because Young has failed to make a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____
        VICTOR E. BIANCHINI
        United States Magistrate Judge

Dated:         November 22, 2010
               Buffalo, New York